1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PROTECT THE PENINSULA'S
FUTURE; COALITION TO PROTECT
PUGET SOUND HABITAT; and
BEYOND PESTICIDES,

              Plaintiffs,

    v.

DEB HAALAND, SECRETARY OF
THE INTERIOR; UNITED STATES
FISH AND WILDLIFE SERVICE;
MARTHA WILLIAMS, DIRECTOR OF
UNITED STATES FISH AND
WILDLIFE SERVICE; HUGH
MORRISON, REGIONAL DIRECTOR
OF THE PACIFIC REGION; and
JENNIFER BROWN SCOTT,
PROJECT LEADER, WASHIN,

              Defendants.

CASE NO. CV23-5737-BHS

ORDER

## I.   INTRODUCTION

This matter is before the Court on Defendants' motion to dismiss. Dkt. 13. The

case centers on the Jamestown S'Klallam Tribe's proposed oyster farm in part of their

ancestral homelands in Dungeness Bay. The proposed 30-acre farm falls within the

Dungeness National Wildlife Refuge. The United States Fish and Wildlife Service ("the Service") regulates activity within the refuge pursuant to the Refuge Act.[1] The Service cannot permit a new or expanded use within the refuge without first conducting a "compatibility determination" to ensure that the proposed use is compatible with the wildlife preservation mission of the refuge. 16 U.S.C. § 668dd(d)(3)(A)(i). Additionally, commercial activity requires a special permit from the Service. 50 C.F.R. § 27.97.

The Service has not completed a compatibility determination for the proposed oyster farm nor has it issued a special use permit. It argues that it is not legally required to do either task because it did not make the decision to allow the Tribe to operate the farm. Rather, the Washington State Department of Natural Resources granted an Aquatic Lands Oyster Aquaculture Lease for the tidelands and the Army Corps of Engineers granted a shellfish aquaculture operation pursuant to Section 10 of the Rivers and Harbor Act, 33 U.S.C. § 403. Dkt. 15 at ¶36; *Id.* (Ex. C). The Service contends that the Refuge Act's requirement to complete a compatibility determination "does not attach to decisions made by other sovereigns." Dkt. 13 at 12.

Plaintiffs are varied groups of environmentalists. Dkt. 1 at 2–3. They argue that the Service's failure to complete a compatibility determination and require a special use permit violates the Refuge Act and its implementing regulations. They ask the Court to

---

[1] The National Wildlife Refuge System Administration Act, as amended by the National Wildlife Refuge System Improvement Act (collectively, "Refuge Act"), 16 U.S.C. §§ 668dd–668ee.

1   compel the Service to conduct a compatibility determination and, if the proposed

2   commercial use is determined to be compatible, require a special use permit. Dkt. 1 at 10.

3          Because the Refuge Act does not provide a private right of action and the Service

4   enjoys sovereign immunity as a federal agency, the Court only has subject matter

5   jurisdiction if the claims meet the specifications of the Administrative Procedure Act

6   (APA), 5 U.S.C. § 701. Plaintiffs frame their claims as "failure to act" claims under APA

7   § 706(1), which enables a court to compel agency action "unlawfully withheld." In the

8   alternative, Plaintiffs assert that the Court also has jurisdiction under § 706(2), which

9   enables a court to review final agency actions. They argue that a letter from Hugh

10  Morrison, the regional director of the Service, to Plaintiffs' counsel explaining that the

11  Service will not complete a compatibility determination nor require a special use permit

12  is a final agency action.

13         The Service moves to dismiss Plaintiffs' claims for lack of subject matter

14  jurisdiction or, in the alternative, for failure to state a claim. Dkt. 13. It argues that

15  because "other sovereigns" granted the Tribe permission for the farm, it does not need to

16  complete a compatibility determination nor require a permit. *Id*. at 12. It argues Plaintiffs

17  did not reference the Morrison letter in their complaint but that even if they had, it is not

18  a final agency action because no legal consequences flow from it. Dkt. 18 at 9–10.

19         The Court concludes that the Refuge Act requires the Service to complete a

20  compatibility determination and the Court therefore has jurisdiction over Count 1

21  pursuant to APA § 706(1). For Count 2, the Court concludes that plaintiffs fail to show

22  that issuance of a special use permit is a discrete agency action that the Refuge Act

1   requires the Service to take at this juncture. It therefore concludes that it lacks jurisdiction

2   over Count 2 under APA § 706(1). Finally, the Court concludes that plaintiffs failed to

3   state a plausible claim for relief from a "final agency action" under APA § 706(2).

4   Because plaintiffs could amend their complaint to state a plausible claim for final agency

5   action, the Court dismisses Count 2 without prejudice and with leave to amend.

## II.   BACKGROUND

7       In 2021, The Jamestown S'Klallam Tribe leased a 50-acre tideland parcel pursuant

8   to a "Aquatic Lands Oyster Aquaculture Lease" from Washington State Department of

9   Natural Resources and obtained a shellfish aquaculture permit from the United States

10  Army Corps of Engineers to establish a commercial oyster in Dungeness Bay. Dkt. 1 at

11  ¶¶ 35–36; Dkt. 15 at 21 (Ex. C). The Refuge is located near Sequim, Washington, on the

12  north end of the Olympic Peninsula. *Id.* ¶ 34. The Tribe's proposed oyster farm would

13  cultivate approximately 34 acres of non-native Pacific oysters within the Dungeness

14  National Wildlife Refuge. Dkt.1 at ¶ 36. The Dungeness Refuge is part of the National

15  Wildlife Refuge System administered by the Service pursuant to the Refuge Act. 16

16  U.S.C. §§ 668dd–668ee.

17      The National Refuge System's mission is "to administer a national network of

18  lands and waters for the conservation, management, and where appropriate, restoration of

19  the fish, wildlife, and plant resources and their habitats within the United States[.]" 16

20  U.S.C. § 668dd(a)(2). Congress tasked the Service with the duty to "ensure that the

21  mission of the [Refuge] System . . . and the purposes of each refuge are carried out. 16

22

1   U.S.C. § 668dd(a)(4)(D). The Refuge Act is codified at 16 U.S.C. §§ 668dd–668ee and

2   its implementing regulations are 50 C.F.R. § 25.11 through § 38.17.

3         The Refuge is closed to the public unless the Service opens it in accordance with

4   the Refuge Act and its implementing regulations. 50 C.F.R. § 25.21. The Dungeness

5   Refuge in particular closes its tidelands within 100 yards of the shoreline year-round to

6   all public access. Dkt. 15 at 5–9 (Ex. B). Tidelands in Dungeness Harbor and Bay are

7   closed to the public from October 1 – May 14 to protect migratory birds. *Id*.

8         Two control mechanisms for public access to the Refuge are at issue in the present

9   case: a compatibility determination and special use permits. The Refuge Act allows the

10  Service to open the refuge for "any purpose, including but not limited to hunting, fishing,

11  [and] public recreation" but only after the Service "determines that such uses are

12  compatible with the major purposes for which such areas were established." 16 U.S.C. §

13  668dd(d)(1)(a). Regulations guide the Service in how to conduct compatibility

14  determinations. *See* 50 CFR 26.41.; 50 C.F.R. § 25.21(b).  A "compatible use" is one

15  which the Refuge Manager determines "will not materially interfere with or detract from

16  the fulfillment of the mission of the System or purposes of the refuge. 16 U.S.C. §

17  668ee(1). The Refuge Act is clear that compatibility determinations are mandatory. 16

18  U.S.C. § 668dd(d)(3)(A)(i) instructs that the Service "shall not initiate or permit a new

19  use of a refuge or expand, renew, or extend an existing use of a refuge, unless the

20  [Service] has determined that the use is a compatible use and that the use is not

21  inconsistent with public safety." If the Service determines the use is compatible, it may

22

open the area through any one of three mechanisms: (1) issue a regulation; (2) provide an individual permit; or (3) provide a public notice. 50 C.F.R. § 25.21(a).

The requirement for special use permits springs from the Refuge Act's implementing regulations. The regulations prohibit "conducting a commercial enterprise on any national wildlife refuge except as may be authorized by special permit." 50 C.F.R. § 27.97. Additionally, regulations generally prohibit collecting any plant or animal on any national wildlife refuge "except by special permit." 50 C.F.R. § 27.51(a). The regulations deputize the Service to issue special use permits and prohibit any activity that lacks a necessary permit. *See* 50 C.F.R. § 25.41; 50 C.F.R. § 25.43.

In the present case, the Service completed a draft compatibility determination which concluded the Tribe's oyster farm is incompatible with the Refuge's purposes. Dkt. 15 at 27 (Ex. D). A "key issue" was that the oyster farm would operate year-round and would be located entirely within the area of the Refuge that is closed from October 1 – May 14 for use by tens of thousands of migrating and wintering waterfowl. *Id*. The Service official responsible for managing the Dungeness Refuge, Jennifer Brown Scott, opined to the Army Corps of Engineers that the Tribe's commercial oyster farm "will cause an unacceptable level of impact" to the Refuge. Dkt. 15 at 32 (Ex. E). She determined that "[i]n addition to unacceptable levels of human disturbance, Refuge wildlife … would also be negatively impacted by limited eelgrass regrowth within the site" and that "[c]ascading impacts from these habitat changes would negatively impact forage fish, Threatened salmonids, seabirds, and other Federal Trust Species." *Id*. at 33. The regional director for the Service, Hugh Morrison, informed the Service Director in

1   May 2022 that "the Service cannot allow the proposed activity unless the entirety of the

2   commercial oyster farming operation within the Refuge boundary is found Compatible

3   with Refuge purposes." Dkt. 15 at 27–28 (Ex. D).

4           Counsel for Plaintiffs wrote to the Service to inquire about the status of agency

5   action regarding the proposed oyster farm in March 2023. Dkt. 15 at 59 (Ex. I). The letter

6   advised the Service that "before filing a failure to act claim under the Administrative

7   Procedures Act, we are writing to confirm that no compatibility determination or special

8   use permit has been issued by USFWS for the project." *Id*. Morrison responded in a

9   letter. Dkt. 15 at 62 (Ex. J). He explained why the Service would not take either action:

> The U.S. Fish and Wildlife service has not completed a compatibility
> determination or issued a special use permit for the Jamestown S'Klallam
> Tribe's proposal to resume aquaculture operations on the area it has leased
> from the State of Washington.
>
> The Dungeness National Wildlife Refuge holds an easement over the
> tidelands area where the State issued lease is located; the State of
> Washington retains the remaining property interests. Jamestown S'Klallam
> Tribe has a long history of shellfishing and reserved treaty rights[2] in
> Dungeness Bay. Development of a compatibility determination is not
> appropriate in this instance where these pre-existing property rights exist.
>
> As a result, no further approvals are needed from the U.S. Fish and Wildlife
> Service for the Jamestown S'Klallam Tribe to resume aquaculture
> operation on the State-leased portions of Dungeness National Wildlife
> Refuge. There are existing permits and leases with county, state, and
> federal approvals that govern the project.

---

[2] The Service does not explain how this assertion squares with Morrison's conclusion in his memorandum to the Service Director that "the Regional Office of the Solicitor analyzed the shellfish Settlement Agreement in U.S. v. Washington (2007) and it does not appear the Tribe has a treaty right for shell fishing in the lease area." Dkt. 15 at 27 (Ex. D). This Order does not resolve this issue.

Dkt. 15 at 62 (Ex. J).

Plaintiffs sued and assert two claims. Dkt. 1. In Count 1, Plaintiffs contend that the Service violated the Refuge Act[3] and its implementing regulations by failing to complete a compatibility determination for the proposed oyster farm. Dkt. 1 at 9. In Count 2, Plaintiffs contend that the Service violated the Refuge Act and its regulations[4] by failing to require the tribe to obtain a special use permit. *Id.* at 10. Plaintiffs framed both claims as "failure to act" claims pursuant to the APA 5 U.S.C. § 706(1). This section allows claims where an agency failed to take a discrete agency action that it is required to take. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Plaintiffs ask the Court to "Declare that Defendants are in violation of the Refuge Improvement Act and its implementing regulations" and "[o]rder Defendants to conduct a compatibility determination and, if the proposed commercial use is determined to be compatible, require a special use permit." Dkt. 1 at 10.

As an alternative to their "failure to act" framing, Plaintiffs argue that the Court also has jurisdiction over their claims pursuant to the "final agency action" section of the APA, 5 U.S.C. §706(2). This allows judicial review for final agency actions from which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotations omitted). Plaintiffs contend that the Service took a reviewable final agency action in authorizing

---

[3] 16 U.S.C. § 668dd(d)(1)(A).

[4] 50 C.F.R. § 27.97.

ORDER - 8

1    the proposed commercial use of the Refuge without conducting a compatibility

2    determination or requiring a special use permit. Dkt. 14 at 14. They argue that the

3    Morrison letter constitutes a final agency action. *Id*. at 20.

4         The Service moves to dismiss plaintiffs' claims for lack of subject matter

5    jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, for

6    failure to state a claim under Rule 12(b)(6). Dkt. 18 at 5. It contends Plaintiffs cannot

7    plausibly assert a § 706(1) failure to act claim because the Service is not "legally

8    compelled" to complete a compatibility assessment or to require a special use permit. *Id*.

9    at 6, 13. It argues that the need to complete a compatibility determination and require a

10   permit is only triggered when the Service itself decides to open the refuge to the public.

11   Dkt. 13 at 12. It argues a compatibility determination was not triggered here because the

12   State of Washington and the Army Corps of Engineers leased the land and granted

13   permission. *Id*. Alternatively, the Service argues that the Court can dismiss for failure to

14   state a claim because plaintiffs failed to plead "any factual allegations that the Service

15   undertook an affirmative action which requires a compatibility determination." *Id*. at 13.

16        The Service argues the Plaintiffs cannot state a claim for final agency action under

17   APA § 706(2) because they did not reference the letter nor any other final agency action

18   in their complaint. Dkt. 18 at 9. It argues that even if plaintiffs had provided sufficient

19   factual allegations, the letter does not qualify as a final agency action because it does not

20   cause legal consequences. *Id*. at 10.

21

22

1

### III.  APPLICABLE STANDARDS

**A.    12(b)(1)**

2

3       A motion to dismiss for lack of subject matter jurisdiction pursuant to Federal

4   Rule of Civil Procedure 12(b)(1) raises the threshold question of whether the Court can

5   adjudicate the claims. The plaintiff bears the burden of proof on questions of subject

6   matter jurisdiction. *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th

7   Cir. 1989). The Court generally accepts as true well-pleaded allegations of material fact

8   for 12(b)(1) attacks. *Savage v. Glendale Union High Sch.*, Dist. No. 205, 343 F.3d 1036,

9   1039 n. 1 (9th Cir.2003).

**B.    12(b)(6)**

10

11       Dismissal under Federal Rule of Civil Procedure 12(b)(6) may be based on either

12   the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

13   cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

14   1988). The "complaint must contain sufficient factual matter, accepted as true, to 'state a

15   claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009)

16   (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible when the factual

17   content allows the court to reasonably infer that the defendant is liable. *Id.* To survive, the

18   complaint's "[f]actual allegations must be enough to raise a right to relief above the

19   speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When

20   adjudicating a 12(b)(6) motion, the court must accept as true all of the factual allegations

21   in the complaint and construe them in the light most favorable to the plaintiff. *Lazy Y*

22   *Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). The Supreme Court instructs

1    however that "the tenet that a court must accept as true all of the allegations contained in

2    a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the

3    elements of a cause of action, supported by mere conclusory statements, do not suffice."

4    *Iqbal*, 556 U.S. at 678.

5         In dismissals or failure to state a claim on a 12(b)(6) motion, "a district court

6    should grant leave to amend even if no request to amend the pleading was made, unless it

7    determines that the pleading could not possibly be cured by the allegation of other facts."

8    *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990).

9                                    **IV.   DISCUSSION**

10        A plaintiff attempting to sue a federal agency must demonstrate that the claims

11   are "covered by a specific statutory authorization to sue the United States" in order

12   comport with the government and its agencies' sovereign immunity from lawsuits. *Weber*

13   *v. Department of Veterans Affairs,* 521 F.3d 1061, 1065 (9th Cir.2008) (internal quotation

     marks omitted). The parties agree that Refuge Act does not provide a private right of

14   action and that the APA is the only means of piercing the Service's sovereign immunity.

15   *See Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*, 457 F.3d 941, 950 (9th Cir.

16   2006).

17        Unless the claims meet the requirements of §701 of the APA, the Court lacks

18   subject matter jurisdiction over the claims. *See Eason Land Co., LLC v. U.S. Dep't of the*

19   *Interior, Sec'y*, 703 F. App'x 498, 500 (9th Cir. 2017) ("Because [plaintiffs] do not

     challenge a failure to take or unreasonably delay a discrete agency action that is legally

20   compelled, the district court did not have subject matter jurisdiction over their § 706(1)

21   claim."); *see also Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 594 (D.C. Cir.

22

2001) ("the requirement of a final agency action is considered jurisdictional. If the agency action is not final, the court ... cannot reach the merits of the dispute.").

Plaintiffs argue that two sections of the APA are each sufficient to allow the Court jurisdiction to hear their claims. The first is § 706(1), which provides that a court may compel agency action "unlawfully withheld or unreasonably delayed." The second is § 706(2), which allows the court to "hold unlawful and set aside" final agency actions. The court addresses each ground for jurisdiction in turn.

## A.   Jurisdiction to compel a compatibility determination under APA § 701(1)

The first issue is whether Plaintiffs have plausibly pled that a compatibility determination is a discrete agency action that the Refuge Act and its implementing regulations requires the Service to undertake. For the reasons explained below, Plaintiffs succeed, and the Court therefore has jurisdiction under the "failure to act" section of the APA, § 701(1) over Count 1.

To compel agency action pursuant to a failure to act claim, plaintiffs must show the "withheld" act is both discrete and legally required. *SUWA*, 542 U.S. at 63–65. Section 706(1) "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act' or to take action upon a matter, without directing how it shall act." *Id*. at 64 (quoting Attorney General's Manual on the Administrative Procedure Act 108 (1947)). "The agency action must be pursuant to a legal obligation 'so clearly set forth that it could traditionally have been enforced through a writ of mandamus.'" *Viet. Veterans of Am. v. CIA*, 811 F.3d 1068, 1075–76 (9th Cir. 2016) (quoting *Hells Canyon Pres. Council v. U.S. Forest Serv.,* 593 F.3d 923, 932 (9th Cir. 2010)).

1    The Court is persuaded that a compatibility determination qualifies as a "discrete

2    act." To its credit, the Service makes no argument to the contrary. The contested issue is

3    whether the Service is legally required to complete a compatibility determination.

4    Plaintiffs contend that the Refuge Act unequivocally requires the Service to complete a

5    compatibility determination for the proposed oyster farm. Dkt. 14 at 15. They point to 16

6    U.S.C. § 668dd(d)(3)(A)(i): the Service "shall not initiate or permit a new use of a refuge

7    or expand, renew, or extend an existing use of a refuge, unless the [Service] has

8    determined that the use is a compatible use and that the use is not inconsistent with public

9    safety." They argue that "when a person or entity initiates or expands a use within a

10   refuge area, the Service *shall not allow that use* to continue unless and until the [Service]

11   has determined that it is compatible with the with the major purposes for which the

12   refuge area was established." Dkt. 14 10–11 (citing 16 U.S.C. § 668dd(d)(1)(A) and 16

13   U.S.C. § 668dd(d)(3)(A)(i)).

14   The Service argues that it is not "legally required" to complete a compatibility

15   determination because it did not open the refuge to the public or authorize the oyster

16   farm, but rather "other sovereigns" granted permission to the Tribe. Dkt. 13 at 12. It

17   asserts that "nothing in the Refuge Act or its implementing regulations compel the

18   Service to undertake a compatibility determination in the absence of a decision to open

19   the Refuge to a new or expanded use" and the "complaint makes no allegation that the

20   Service has done *anything* to 'open' refuge areas or even that it plans to do so." Dkt. 13 at

21   7. It contends that "[a]n authorization from the State to the Tribe does not create a legal

22   requirement for the *Service* to undertake a compatibility determination" but rather a

1  "compatibility determination serves only as a step in the Service's decision-making

2  process; the requirement does not attach to decisions made by other sovereigns." *Id*. at

3  12. It confines its 12(b)(6) argument to one sentence: "Alternatively, the allegations

4  contained in Count 1 do not move the claim from possible to plausible because Plaintiffs

5  have failed to plead any factual allegations that the Service undertook an affirmative

6  action which requires a compatibility determination." *Id*. at 13.

7        The Service argues further that nothing requires it to stop the oyster farm from

8  operating: "neither [16 U.S.C. §668dd(d)(1)(A) nor 16 U.S.C. § 668dd(d)(3)(A)(i)]

9  suggests that the Service is obligated to stop an unpermitted use.  Such an enforcement

10  action is committed to the agency's discretion by law." Dkt. 18 at 7 (citing *Heckler v.*

11  *Chaney*, 470 U.S. 821, 831–32 (1985)). Even if enforcement were warranted, the Service

12  contends because the oyster farm is not yet operating, it cannot yet enforce the permit

13  requirement. *Id*. In sum, the Service argues that "[b]ecause a compatibility determination

14  only exists to support a decision by the Service to permit (or not permit) a proposed use,"

15  as opposed to a decision by the State, "Plaintiffs are effectively seeking an order from the

16  Court compelling the Service to first assert authority over the proposed project and then

17  subsequently either grant or deny the project a permit." Dkt. 18 at 7–8.

18        Although the Service's arguments may be appropriate for consideration on the

19  merits, at the motion to dismiss stage the Court is satisfied both that it has jurisdiction

20  over Count 1 and that the complaint contains sufficient factual matter, which accepted as

21  true, states plausible claim that the compatibility determination is a discrete agency act

22  that the Service is required to take.

1    Plain language in multiple provisions of the Refuge Act and its implementing

2  regulations command this result. The Refuge Act mandates that the Service "*shall* not

3  initiate *or permit* a new use of a refuge or expand, renew, or extend an existing use of a

4  refuge, *unless* the [Service] has determined that the use is a compatible use and that the

5  use is not inconsistent with public safety." 16 U.S.C. § 668dd(d)(3)(A)(i) (emphasis

6  added). The Service concedes that this provision "prohibits the Service from initiating or

7  permitting a new or expanded use without first determining whether the use is

8  compatible." Dkt. 18 at 7. On this record, the proposed oyster farm qualifies as a "new or

9  expanded use" of the refuge. The Service makes no argument to the contrary. The

10  statute's use of "shall" renders the Service's responsibility to conduct a compatibility

11  determination mandatory. *See Firebaugh Canal Co*., 203 F.3d at 573–74 (9th Cir. 2000).

12  Indeed, the Court here reaches the same conclusion as Morrison in his 2022

13  memorandum to the Service Director that "provisions of the National Wildlife Refuge

14  Improvement Act require a Refuge Manager determination of whether proposed uses are

15  compatible with the purposes of the Refuge (i.e., Compatibility Determination)." Dkt. 15

16  at 27 (Ex. D). Furthermore, 50 C.F.R. § 26.41(d) requires that if the Service determines

17  that an existing use is not compatible, it will "expeditiously terminate or modify the use

18  to make it compatible."

19    Nothing in the language of § 668dd(d)(3)(A)(i) or 50 C.F.R. § 26.41(d) supports

20  the Service's argument that a compatibility determination is only triggered when the

21  Service itself deigns to authorize a new or expanded use of the refuge. The Service

22  provides no authority for its argument that it is absolved of its responsibility to conduct a

1   compatibility determination when the State authorizes a new or expanded use.

2   Additionally, this argument is directly contradicted in the Service's own memorandum

3   authored by Morrison to the Secretary of the Service in May 2022 which states that "[t]he

4   State owns the land for the identified area; however the Service has an easement with the

5   State which provides jurisdiction to the Service for determining compatibility of uses of

6   the property" and that "the Service cannot allow the proposed activity unless the entirety

7   of the commercial oyster farming operation within the Refuge boundary is found

8   Compatible with Refuge purposes." Dkt. 15 at 27–28 (Ex. D). In any event, under the

9   plain language of the Refuge Act, the Service's obligation to conduct a compatibility

10   assessment is triggered by a proposed new use of the refuge, not "an affirmative action by

11   the Service"[5] to open the refuge.

12        To conclude otherwise would lead to absurd results. It would require the Court to

13   ignore the clear instructions in the Refuge Act and its regulations that deputize the

14   Service to regulate activity within the Refuge. Indulging the Service's position would

15   also require ignoring the points in the Refuge Act that carefully instruct the Service on

16   how to navigate conflicting or concurrent authority within a refuge. For example, §

17   668dd(d)(4)(B) requires that even if a different federal agency has primary jurisdiction

18   over a portion of a refuge, the Service still must have a "memorandum of understanding"

19   between it and that agency "governing the use of the refuge." Similarly, § 668dd(d)(2)

20   dictates strict restrictions surrounding when the Service can grant easements to "any

21

22      [5] Dkt. 13 at 12.

1   Federal, State, or local agency or to any private individual or organization." The

2   Service's argument that it can ignore a proposed commercial use of the refuge simply

3   because the State authorized it is contrary to the plain language of 16 U.S.C. §

4   668dd(d)(3)(A)(i) and inconsistent with § 668dd(d) generally. Granting relief would not

5   require the Service to "assert authority" over the oyster farm. Dkt. 18 at 8. It already

6   bears that authority under 16 U.S.C. § 668dd(d)(3)(A)(i) because the tribe proposed an

7   expanded use of a national wildlife refuge. And a compatibility determination does not

8   "only exist[] to support a decision by the Service to permit (or not permit) a proposed

9   use." *Id*. It is also a necessary step to enable the Service to "expeditiously terminate or

10  modify [a] use to make it compatible." 50 C.F.R. § 26.41(d). It bears repeating that the

11  Service already acknowledged that it "cannot allow the proposed activity unless the

12  entirety of the commercial oyster farming operation within the Refuge boundary is found

13  Compatible with the Refuge purposes." Dkt. 15 at 28 (Ex. D).

14          The Court notes that the lack of clarity in the briefing regarding potentially

15  competing authority of the State of Washington over the state-owned tidelands or the

16  Tribe's treaty rights within the refuge complicates its analysis. The Service does not

17  explain how or whether the property interests and authority of the State or Tribe change

18  its duties under the Refuge Act and its implementing regulations. It dispenses with the

19  issue in conclusory terms in both the Morrison letter and its briefing. Morrison asserts

20  that "[a]s a result" of the Tribe's lease of the tidelands and its permit from the Army

21  Corps of Engineers, "no further approvals are needed from the U.S. Fish and Wildlife

22  Service" and that there are "existing permits and leases with county, state, and federal

1    approvals that govern the project." Dkt. 15 at 62 (Ex. J). The Service provides no legal

2    authority for this position in the letter or its briefing. Instead, in its briefing the Service

3    leaves the issue for later in litigation: "Should this case proceed to summary judgment,

4    the question before the Court would be the scope of the Service's authority over the

5    State-owned parcel in question and whether a permit from the Service is required for the

6    proposed activity on these lands." Dkt. 18 at 12.

7           Contrary to the Service's argument that the issue can be left until later, "the scope

8    of the Service's authority" and "whether a permit from the Service is required for the

9    proposed activity on these lands" are threshold issues for jurisdiction under the APA. If

10   the Refuge Act and its implementing regulations clearly require the Service to complete a

11   compatibility determination and require a permit for the proposed activity in the Refuge,

12   then the Court has jurisdiction under § 706(1). The plain language of the Refuge Act and

13   its implementing regulations mandate the Service to complete a compatibility

14   determination whenever there is a new or expanded use of the refuge.

15          Accordingly, the Service's motion to dismiss Count 1 under Federal Rules of

16   Civil Procedure 12(b)(1) and 12(b)(6) is **DENIED**.

17   **B.    Jurisdiction over Count 2 to compel the Service to require a Special Use
     Permit under APA § 701(1)**

18          The next issue is whether Plaintiffs have plausibly pled that issuing a special use

19   permit is a discrete agency action that the Refuge Act and its implementing regulations

20   requires the Service to take. The requested agency action is contingent on too many

21

22

1    variables and the Court therefore lacks jurisdiction under the "failure to act" section of

2    the APA, § 701(1) over Count 2.

3         Plaintiffs argue that the Service cannot allow the oyster farm "to continue without

4    a special use permit." Dkt. 14 at 17–18. They argue that requiring a permit is a non-

5    discretionary discrete agency action primarily because 50 C.F.R. § 27.97 dictates that

6    "conducting a commercial enterprise on any national wildlife refuge is prohibited except

7    as may be authorized by special permit." Plaintiffs point to the fact that 50 C.F.R. § 25.42

8    requires anyone within the Refuge to show a permit "authorizing their presence and

9    activity" upon request as further support that the Service can and must require special use

10   permits. Dkt. 14 at 18.

11        The Service argues that the Court lacks jurisdiction under § 706(1) for Count 2

12   because no statute or regulation "unequivocally compels" the Service to require the Tribe

13   to obtain a special use permit for the proposed oyster farm. Dkt. 13 at 13 (quoting *Viet.*

14   *Veterans of Am.*, 811 F.3d at 1081). It argues that "the regulation Plaintiffs rely on (50

15   C.F.R. § 27.97) is a prohibition that regulates *the public*, not a requirement for the

16   Service to 'require' such permits." *Id*. The Service points to its own regulations that

17   instruct "part 27 govern[s] those acts *by the public* which are prohibited at all times

18   except as permitted in this part, part 26, and part 25, subpart D—Permits." Dkt. 13 at 13

19   (quoting 50 C.F.R. § 27.11).

20        The Service additionally argues that a decision to penalize the Tribe for failure to

21   obtain a special use permit is an enforcement action entirely within its discretion. It

22   asserts that if someone "'conduct[s] a commercial enterprise on any national wildlife

1    refuge' without first obtaining a special use permit, the Service's only available option

2    under the regulations is to take an enforcement action" and that "an agency's decision on

3    whether to take an enforcement action is committed to the agency's discretion." Dkt. 13

4    at 14 (quoting 50 C.F.R. § 27.97) (citing *Heckler*, 470 U.S. at 831–32; 5 U.S.C. §

5    701(a)(2)).

6        The Court concludes that plaintiffs have not yet shown that the Court can compel

7    the Service to issue a permit or penalize the Tribe for lacking one before the oyster farm

8    is operating. Consequently, § 706(1) cannot provide the Court jurisdiction over Count 2.

9    Although Plaintiffs argue persuasively that it is hardly consistent with the Refuge Act for

10    the Service to simply ignore a proposed commercial use within the Refuge that lacks a

11    special use permit, the Service's obligation to enforce the permit requirement for a

12    proposed future use is not "so clearly set forth that it could traditionally have been

13    enforced through a writ of mandamus." *Viet. Veterans of Am.*, 811 F.3d at 1075–76

14    (quoting *Hells Canyon*, 593 F.3d at 932). Plaintiffs' complaint asks the Court to "[o]rder

15    Defendants to conduct a compatibility determination and, *if* the proposed commercial use

16    is determined to be compatible, require a special use permit." Dkt. 1 at 10 (emphasis

17    added). Relief is therefore contingent on a preceding agency action or on the Tribe itself

18    either seeking a permit or operating the farm without one. Consequently, the agency

19    action that plaintiffs seek to compel is too hypothetical to qualify under § 706(1).[6] Unlike

20    the regulations requiring the Service itself to conduct a compatibility assessment before a

21    _____

22    [6] The briefing is anemic on the impact of the State's and the Army Corps of Engineers' authorizations on the Service's obligations under the Refuge Act.

1   proposed expanded use begins, 50 C.F.R. § 27.97 does not mandate a discrete agency

2   action that the Court could compel before the oyster farm begins operating.

3   **C.      Jurisdiction over a "final agency action" pursuant to APA § 706(2)**

4           The final issue is whether the complaint states a plausible claim for review of final

5   agency action under APA § 706(2). "As a general matter, two conditions must be

6   satisfied for agency action to be final: First, the action must mark the consummation of

7   the agency's decisionmaking process-it must not be of a merely tentative or interlocutory

8   nature. And second, the action must be one by which rights or obligations have been

9   determined, or from which legal consequences will flow." *Fairbanks North Star Borough*

10  *v. U.S. Army Corps of Engineers,* 543 F.3d 586 (9th Cir.2008) (quoting *Bennett v. Spear*,

11  520 U.S. 154, 177–78, (1997)).

12          Plaintiffs assert that "the Service took final agency action when it decided that it

13  will not issue a compatibility determination or require a special use permit." Dkt. 14 at

14  19. They argue that the Morrison letter is a final agency action. *Id*. Consequently, they

15  assert that § 706(2) provides alternate grounds for jurisdiction for the Court to adjudicate

16  their claims.

17          The Service argues that the "complaint simply does not meet the basic pleading

18  requirements to permit this Court to review the letter as a 'final agency action.'" Dkt. 18

19  at 10. It observes that the "letter is referenced nowhere in their complaint" and that

20  "neither of the claims for relief request judicial review of this letter; nor do any of the

21  requests for relief relate to this letter." *Id*. at 9. It contends that the "complaint is devoid

22  of any final agency action for the Court to review." *Id*. Consequently, it argues the

1    complaint does not "raise sufficient factual allegations, accepted as true, to 'state a claim

2    to relief that is plausible on its face.'" *Id*. (citing *Miranda v. Selig*, 860 F.3d 1237, 1239

3    (9th Cir. 2017) (quoting *Twombly*, 550 U.S. at 570). It argues that even if the complaint

4    were properly pled, the letter does not qualify as a final agency action because "no legal

5    consequences flow" from it. *Id*. at 10.

6          The Court agrees that the complaint does not state a plausible claim for relief

7    based on final agency action as required for § 701(2) jurisdiction. The closest that the

8    complaint comes to referencing the letter is where it alleges "[t]he Service has informed

9    plaintiffs that the Service does not intend to complete a compatibility determination or

10   require a special use permit for the Tribe's proposal at any time in the future." Dkt. 1 at ¶

11   11. Even accepting this allegation as true and construing it in a light most favorable to

12   plaintiffs, there is not enough factual content showing a final agency action to "raise a

13   right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The complaint is

14   devoid of facts showing that the person who communicated the agency's position had

15   authority to do so or facts showing that the decision was final. At best, the complaint

16   contains only "conclusory statements" that the Service reached a final decision. *Iqbal*,

17   556 U.S. at 678. This is not sufficient to state a plausible claim for relief for final agency

18   action. *Id*.

19         Based on the current record, the Court determines it is possible that the plaintiffs

20   can amend their complaint to provide additional factual allegations to render a claim for

21   final agency action under §701(2) plausible. For example, Plaintiff's briefing succeeds

22   where the complaint fails to explain the context and content of the alleged final agency

action. This includes but is not limited to facts explaining how Morrison informed Plaintiffs that the Service would not complete a compatibility determination or issue a special use permit because it concluded "that existing permits and leases with county, state, and federal approvals" "govern" the project. Dkt. 14 at 20; Dkt. 15 at 62 (Ex. J). The record also includes the fact that the letter came in response to an inquiry from Plaintiffs' counsel where plaintiffs made clear that they intended to sue if the Service failed to complete a compatibility determination and/or require a special use permit. Dkt. 15 at 59 (Ex. I). These facts and more make it possible that plaintiffs could amend their complaint to cure deficiencies to state a claim under §701(2). *Cook.*, 911 F.2d at 247.

Accordingly, the Court **DISMISSES** Count 2 **without prejudice** and **with leave to amend.**

## V.   ORDER

Therefore, it is hereby **ORDERED** that defendant's motion to dismiss, Dkt.13, is **GRANTED in part** and **DENIED in part**.

The motion is **GRANTED** insofar as Count 2 is **dismissed without prejudice** and **with leave to amend.**

The motion's attempt to dismiss Count 1 is **DENIED**.

Should Plaintiffs decide to file an amended complaint, they are hereby ordered to do so **within twenty-one days**. Any response is due fourteen days after the filing of an amended complaint. *See* Local Rules, W.D. Wash. LCR 12.

//

//

Dated this 17th day of July, 2024.

BENJAMIN H. SETTLE
United States District Judge