1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

PROTECT THE PENINSULA'S
FUTURE; COALITION TO PROTECT
PUGET SOUND HABITAT; and
BEYOND PESTICIDES,

              Plaintiffs,

    v.

DEB HAALAND, SECRETARY OF
THE INTERIOR; UNITED STATES
FISH AND WILDLIFE SERVICE;
MARTHA WILLIAMS, DIRECTOR OF
UNITED STATES FISH AND
WILDLIFE SERVICE; HUGH
MORRISON, REGIONAL DIRECTOR
OF THE PACIFIC REGION; and
JENNIFER BROWN SCOTT,
PROJECT LEADER, WASHIN,

              Defendants.

CASE NO. CV23-5737-BHS

ORDER

19

20

21

22

      This matter is before the Court on Limited Intervenor Jamestown S'Klallam
Tribe's motion to dismiss. Dkt. 44. Jamestown asserts that it is a required party under
Rule 19 because this case impedes its lease and treaty rights, but that it cannot be joined
due to its sovereign immunity. It argues that the Court therefore must dismiss this action

under Rule 12(b)(7). Because the claims here seek only prospective, injunctive relief requiring the Service to comply with Refuge Act procedures, and because Jamestown failed in its burden to show compliance would destroy any legally protected interest, it is not a required party. Even if it were, the public interest exception to traditional joinder rules would allow the case to go forward because the claims seek to vindicate a public right to administrative mandates to protect the Refuge. Jamestown's motion to dismiss is denied.

## I.    BACKGROUND

### 1.    Procedural posture

This case centers on United States Fish and Wildlife's (the Service's) administrative duties regarding the Jamestown S'Klallam Tribe's proposed oyster farm located on tidelands it leased from the State within the Dungeness Wildlife Refuge on the north end of the Olympic Peninsula. An explanation of the proposed oyster farm and an overview of the Dungeness Wildlife Refuge are in the Court's previous order, Dkt. 20, and incorporated by reference here. A summary of the litigation and contested property interests follows for ease of reference.

Protect the Peninsula along with fellow environmental protection groups sued the Service and related federal defendants, alleging the Service violated the Refuge Act[1] because it failed to fulfill its mandatory administrative duties to conduct a compatibility

---

[1] The National Wildlife Refuge System Administration Act, as amended by the National Wildlife Refuge System Improvement Act (collectively, Refuge Act), 16 U.S.C. §§ 668dd–668ee.

1   determination (count 1) and/or require a special use permit (count 2) for Jamestown's

2   proposed oyster farm within the Refuge. Dkt. 22.

3          The Service moved to dismiss the action for lack of subject matter jurisdiction and

4   failure to state a claim. Dkt. 13. It argued that because "other sovereigns" granted

5   Jamestown permission for the farm, it does not need to complete a compatibility

6   determination nor require a permit, and that plaintiffs lacked a final agency action to

7   challenge. *Id*. at 12.

8          The Court denied in part the Service's motion to dismiss. Dkt. 20. It concluded

9   that the Refuge Act requires the Service to complete a compatibility determination. It

10  granted dismissal on count 2, however, concluding that plaintiffs failed to show that

11  issuance of a special use permit is a discrete agency action that the Refuge Act requires

12  the Service to take at that juncture. Finally, it concluded that plaintiffs failed to state a

13  plausible claim for relief from a final agency action under APA § 706(2), but allowed

14  them leave to amend.

15         Protect the Peninsula timely filed an amended complaint. Dkt. 22. Jamestown filed

16  a motion to intervene for the limited purpose of moving to dismiss plaintiffs' claims

17  without waiving its sovereign immunity. Dkt. 29. The Court granted limited intervention

18  as a matter of right under Rule 24(a)(2). Dkt. 42.

19         Jamestown now moves to dismiss this case under Rule 12(b)(7) asserting it is a

20  required, indispensable party that cannot be joined due to its sovereign immunity. Dkt.

21  44. It argues that it is required because it has protectable interests from its lease for the

22  tidelands, oyster farm investment, treaty rights, and sovereignty. *Id*. at 10.

Protect the Peninsula argues that Jamestown is not a necessary party because the claims here are purely procedural, and will only affect future compliance with administrative process. Dkt. 57 at 17. Even if the Tribe was a required party, it argues the public rights exception to traditional joinder rules applies because its claims seek to benefit the public by requiring the Service to honor its administrative duties.

The Service does not take a position on whether Jamestown is a required party, but it asserts that if the Court reaches the merits, it has the authority to control Jamestown's activity within the Refuge because of its easement from the State. Dkt. 56.

## 2.    Property interests in the Dungeness Tidelands

Washington State owns the Dungeness Bay tidelands including those within the Refuge. Jamestown has historical ties to the Sequim and Dungeness Bay area, where they have lived and fished, "including gathering and procuring shellfish, long before this country's existence." Dkt. 44 at 7.

In 1915, President Woodrow Wilson established the Dungeness National Wildlife Refuge within the Dungeness Bay as a refuge and breeding ground for native birds. Dkt. 1 at ¶ 30. The Service is tasked with maintaining the refuge pursuant to the Refuge Act. 16 U.S.C. §§ 668dd-668ee.

In 1943, the State executed a "public purpose" easement to the tidelands to the Service. Dkt. 26-2 at 6. The Service uses the tidelands in the easement to maintain the Refuge. Dkt. 56 at 8.

Beginning in 1990, the State leased portions of the Dungeness Bay tidelands to Jamestown. Dkt. 26-2 at 14. Jamestown renewed its lease in 2007, which permitted it to

1   use tidelands for oyster and geoduck cultivation. Dkt. 26-2 at 28–87. In 2021, Jamestown

2   entered its current lease for 50 acres of tidelands through July 2031. Dkt. 26-3 at 51–91.

3   The current lease permits Jamestown to cultivate pacific oysters. Dkt. 26-3 at 53. It states

4   that the leased tidelands are "the subject of a Consent Decree and Settlement Agreement

5   ('Settlement Agreement') in *U.S. v. Washington*, Case No. 2:70-cv-09213-RSM." *Id*. at

6   52. "Under the Settlement Agreement, the signatory Tribes agree not to conduct tribal

7   shellfish harvest on the tidelands while State continues to lease the tidelands to the same

8   Tenant[.]" *Id*. Each lease includes language that the Jamestown's activity in the tidelands

9   is subject to all prior valid interests of third parties, is limited to the natural resources

10  detailed in the lease, and is subject to compliance with government rules and regulations.

11  Dkt. 26-3 at 54 (current lease); Dkt. 26-2 at 52 (2007 lease); *Id*. at 14 (1990 lease).

12      Jamestown maintains that in addition to its lease rights, it also has treaty rights to

13  shellfish in the tidelands. It asserts that it first signed a treaty affirming its right to fish

14  there in 1855 when it signed the Treaty of Point No Point, reserving the right to fish,

15  hunt, and gather "as they always had" within their "usual and accustomed" areas (U&A).

16  12 Stat. 933 (1855). Plaintiffs assert that the Tribe forfeited any treaty rights to farm

17  shellfish within the Refuge when it signed the settlement agreement in *United States v.*

18  *Washington*, 20 F. Supp. 3d 828 (W.D. Wash. 2007). Dkt. 57 at 12. Jamestown argues

19  that the Settlement does not obviate its shellfish rights within the refuge in part because

20  of its lease: "The *shellfish proviso* is limited to addressing access to shellfish on parcels a

21  tribe does not own or control, and, importantly, here, it does not *render* the activity 'non-

22  treaty' (outside the scope) when the tribe is operating on a parcel they control or own

1    (i.e., via lease)." Dkt. 21 at 34. Although it has not taken an official position in this

2    litigation, the record shows that the Service has taken inconsistent positions regarding

3    treaty rights. In a letter to plaintiffs, it asserted the "Tribe has a long history of shell

4    fishing and reserved treaty rights in Dungeness Bay." Dkt. 15 at 62, Ex. J. But in an

5    internal letter to the Service, it determined that Jamestown does not have treaty rights

6    within the Refuge: "the Regional Office of the Solicitor analyzed the shellfish Settlement

7    Agreement in U.S. v. Washington (2007) and it does not appear the Tribe has a treaty

8    right for shell fishing in the lease area." Dkt. 15 at 27, Ex. D.

9        Jamestown now seeks to operate oyster farm within the Refuge on the tidelands it

10   leased from the State to cultivate approximately 34 acres of non-native Pacific oysters.

11   Dkt.1 at ¶ 36. Since around 2015 it has maintained consistent communications with the

12   Service about its proposed farm. *See* Dkt. 58-5 (chronological summary of

13   communication). The Service informed Jamestown that it would need to complete a

14   compatibility determination for the activity within the Refuge. *Id*. at 4. Jamestown

15   additionally obtained necessary permits from other agencies, including a shellfish

16   aquaculture permit from the United States Army Corps of Engineers. Dkt. 15 at 21 (Ex.

17   C).

18       By March 2022 the Service finished a draft compatibility determination that

19   concluded Jamestown's oyster farm incompatible with the Refuge's purposes. Dkt. 15 at

20   27, Ex. D. A "key issue" was that the oyster farm would operate year-round and would be

21   located entirely within the area of the Refuge that is closed from October 1 to May 14 for

22   use by tens of thousands of migrating and wintering waterfowl. *Id*. The regional director

for the Service, Hugh Morrison, informed the Service Director in May 2022 that "the Service cannot allow the proposed activity unless the entirety of the commercial oyster farming operation within the Refuge boundary is found Compatible with Refuge purposes." Dkt. 15 at 27–28, Ex. D.

Despite its draft, the Service did not issue a final decision regarding the compatibility of the proposed oyster farm. Dkt. 56 at 4. When plaintiffs asked the Service whether it would complete the compatibility determination or require a special use permit per the Refute Act, the Service responded that it would do neither because a "compatibility determination is not appropriate in this instance where these pre-existing property rights exist." Dkt. 15 at 62, Ex. J. Plaintiffs sued, and the present litigation ensued.

Whether Jamestown is a required party and whether the public rights exception to traditional joinder rules applies are addressed in turn below.

## II.   DISCUSSION

Courts employ a two-part analysis to determine whether to dismiss a case because a necessary party cannot be joined. First, it determines if an absent party is required as defined in Rule 19. Then, if the party is required but cannot be joined, the court considers four factors to determine whether the party is "indispensable" so that in "equity and good conscience" the suit should be dismissed. *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990). The inquiry is fact specific, practical, and "designed to avoid the harsh results of rigid application." *Id*. The moving party bears the burden of persuasion, and the court accepts allegations in the plaintiff's complaint as true and draws all

1   reasonable inferences in plaintiff's favor. *Diné Citizens Against Ruining Our Env't v.*

2   *Bureau of Indian Affs*., 932 F.3d 843, 851 (9th Cir. 2019); *Sierra Club v. Watt*, 608

3   F.Supp. 305, 312 (E.D.Cal.1985).

4           The Ninth Circuit allows the public rights exception to traditional joinder rules.

5   *Makah*, 910 F.2d at 559 n.6. To qualify, the litigation must "transcend the private

6   interests" of the litigants and seek to vindicate a public right. *Kescoli v. Babbitt*, 101 F.3d

7   1304, 1311 (9th Cir. 1996). If it vindicates a public right, the exception allows litigation

8   to proceed without a required, absent party, even if the party's interest may be adversely

9   affected so long as the litigation does not destroy the absent party's legal entitlements.

10  *Conner v. Burford*, 848 F.2d 1441, 1459 (9th Cir. 1988).

11          Because the claims here narrowly seek prospective, injunctive relief requiring the

12  Service to follow administrative procedures that do not destroy any property rights,

13  Jamestown is not a necessary party. Even if it were, the public rights exception would

14  allow this case to proceed in its absence.

15  **A.      Jamestown is not a required party for prospective procedural claims**

16          Jamestown argues it is a required party because it asserts it has a legally protected

17  interest in its lease rights, its oyster farm investment, treaty rights, and sovereignty. Dkt.

18  44 at 15. It argues plaintiffs' requested relief "necessarily impacts the Tribe's lease

19  agreement" because to prevail, plaintiffs need to demonstrate that the Service has the

20  authority to regulate the Tribe's leasehold activities and that if so, Jamestown lacks a

21  treaty right that would exempt them from a compatibility determination. *Id*. at 16–17.

22

Jamestown further asserts that it has a treaty right to farm shellfish in the Dungeness Spit including the Reserve. Dkt. 21 at 34.

The Service does not take a position on whether Jamestown is a necessary party. Dkt. 56 at 5. But it asserts that the Service's rights under the public use easement from the State "control the decision concerning refuge uses." *Id*. at 8. It contends that after the State granted it the easement in 1943, the State "retained no right to use the tidelands in a manner that would materially interfere with the Service's easement" and "could not thereafter convey such a right" to Jamestown. *Id*. at 8. The Service asserts that the current lease between the State and Jamestown is expressly subject "to all prior valid interests of third parties," which includes the Service, and is "subject to compliance with government rules and regulations." *Id*. at 7 (citing Current Lease, 26-3 at 54).

Protect the Peninsula argues that Jamestown is not a necessary party because its claims are purely procedural and will only affect future compliance with administrative process. Dkt. 57 at 17 (citing *Makah*, 910 F.2d 555). It emphasizes that it does not ask the Court to "predetermine the outcome of the Service's" compatibility determination or to declare the Tribe's operations incompatible with Refuge purposes." *Id*. at 18. It asserts that Jamestown's challenge is premature because "any challenge to the Service's authority to forbid the Tribe from using the tidelands would only arise if, and when, the Service denies the Tribe access or determines that their proposed use is incompatible." *Id*. at 31.

A nonparty is required to be joined in the action if:

that person claims an interest relating to the subject of the action and is so
situated that disposing of the action in the person's absence may as a
practical matter impair or impede the person's ability to protect the interest;
or leave an existing party subject to a substantial risk of incurring double,
multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). "There is no precise formula for determining whether a
particular nonparty should be joined under Rule 19(a)." *Bakia v. Los Angeles Cnty*., 687
F.2d 299, 301 (9th Cir. 1982) (per curiam). But the absent party's interest "must be a
legally protected interest and not merely some stake in the outcome of the litigation."
*Jamul Action Comm*., 974 F.3d at 996. The interest "must be more than a financial stake."
*Diné*, 932 F.3d at 852 (internal quotes omitted). Conversely, "an absent party has no
legally protected interest at stake in a suit merely to enforce compliance with
administrative procedures." *Id*. at 971.

Ninth Circuit law on challenges to federal action under the APA where absent
tribes seek dismissal fall into two camps. If the claims seek prospective compliance with
administrative procedures, and compliance would not destroy the absent tribe's legally
protected interest, the case can proceed without the absent tribes. *See Makah,* 910 F.2d
555. But if the impact of a successful challenge would impair a property right already
granted to the absent tribe, courts dismiss the case. *See Dine*, 932 F.3d at 852.

*Makah* exemplifies the first category. The Makah Indian Tribe challenged federal
regulations allocating a quota to the ocean harvest of salmon for the Makah and at least
twenty-three other absent tribes. The Makah brought two types of claims: (1) it alleged
that the quotas violated treaty rights, and sought reallocation; (2) it challenged the
procedures the Secretary employed to issue the regulations, asserting they violated the

1   Fishery Conservation and Management Act,[2] and sought prospective injunctive relief to

2   require the proper procedures. The question presented was whether the twenty-three

3   absent tribes were necessary and indispensable parties to the case since some of the

4   Makah's claims sought a reallocation of the 1987 harvest quotas overall.

5          The Ninth Circuit affirmed the trial court's ruling that the absent tribes were

6   necessary and indispensable parties for the first type of claim, "to the to the extent the

7   Makah seek a reallocation of the 1987 harvest or challenge the Secretary's inter-tribal

8   allocation decisions." *Id*. at 559. But it determined the absent tribes were not necessary to

9   the Makah's procedural claims, ruling "[t]o the extent that the Makah seek relief that

10  would affect only the future conduct of the administrative process, the claims [] are

11  reasonably susceptible to adjudication without the presence of other tribes." *Id*. It noted

12  that because the procedures for promulgating the challenged regulations were reviewable

13  under the FCMA and APA, the trial court had "authority to grant relief on the Makah's

14  procedural claims without the presence of the other tribes." *Id*. It reasoned that the

15  "absent tribes would not be prejudiced because all of the tribes have an equal interest in

16  an administrative process that is lawful." *Id*.

17         *Diné* illustrates the second category: courts dismiss claims that require retroactive

18  relief that impacts tribes' protectable interests. Plaintiffs there sued the U.S. Department

19  of the Interior challenging a variety of final agency actions that reauthorized coal mining

20  activities on Navajo Nation land. 932 F.3d 843. The actions included discretionary

21  ───────────────

22  [2] Fishery Conservation and Management Act of 1976 (FCMA), Pub. L. 94–265, 90 Stat.
331 (codified at 16 U.S.C. § 1801, *et seq*.)

1    agency decisions such as a lease renewal and permit approvals. *Id*. at 848. The Navajo

2    Transitional Energy Company (NTEC), a corporation wholly owned by the Navajo

3    Nation that owns the mine, intervened for the limited purpose of moving to dismiss. The

4    court determined NTEC had a legally protectable interest in the case. It reasoned that

5    plaintiffs' challenge "does not relate only to the agencies' future administrative process,

6    but instead may have retroactive effects on approvals already granted for mining

7    operations" and that if they "succeeded in their challenge and the agency actions were

8    vacated, NTEC's interest in the existing lease, rights-of-way, and surface mining permits

9    would be impaired" and NTEC's expected revenues lessened. *Id*. at 853.

10        The present case resembles *Makah* rather than *Diné*. The claims here are purely

11   procedural and seek prospective, injunctive relief to require the Service to follow the

12   proper Refuge Act procedures. As in *Makah*, the challenged procedures under the Refuge

13   Act are reviewable under the APA. *See* 5 U.S.C. §§ 701, 706. The claims do not attempt

14   to predetermine the result of a compatibility determination. Nor do they not ask to

15   review, set aside, or vacate a final decision favorable to Jamestown as in *Diné*. And

16   unlike *Diné*, the challenged activity here does not take place on the absent tribe's land,

17   but instead on a wildlife refuge owned by the State, under an easement to the Service and

18   leased to Jamestown. Because Protect the Peninsula seeks "relief that would affect only

19   the future conduct of the administrative process, the claims [] are reasonably susceptible

20   to adjudication without the presence of [Jamestown]." 910 F.2d 555.

21        Jamestown has not shown that merely completing a compatibility determination or

22   requiring a special use permit would impede its lease or treaty rights. Even if the Court

1   grants all the relief sought by Protect the Peninsula, the current lease and any treaty rights

2   Jamestown has will remain fully intact. The existence of a draft compatibility

3   determination that determined the proposed farm incompatible does not alter this

4   analysis. It is not a final agency action, and the Court cannot dismiss the case on

5   speculation that it would be published in its present form or that doing so will impede

6   lease rights.

7           The issue of whether the Service has authority to control Jamestown's activity in

8   the refuge is not ripe for review. Although the Court does not decide the priority of

9   property interests in this Order, it accepts as true the allegations in plaintiffs' complaint

10  and draw all reasonable inferences in plaintiffs' favor. *Diné*, 932 F.3d at 851. The record

11  reveals that Jamestown was aware of the compatibility determination requirement for

12  activities in the refuge even with its asserted lease and treaty rights long before this suit

13  was filed. For example,

- In September 2015 the Service met with Jamestown and "Discussed the process the Refuge would take to determine compatibility." Dkt. 58-5 at 4.

- In April 2016 Jamestown hosted a multiagency meeting where the Service "explained how we would be evaluating the project for compatibility with the Refuge mission/purposes," and noted that Jamestown would "respond to the compatibility questions from FWS" in its application. *Id*. at 5.

- In March 2021 Jamestown requested an update on the Service's compatibility determination. The Service clarified that it was "unable to proceed" with its analysis until the USACE 404 permit was issued to identify the full scope of the activity. *Id*. at 8.

- In September 2021 the Service gave Jamestown a courtesy call to explain compatibility determination "in process by DNWR manager is finding access to the lease site to be incompatible with refuge functions/purpose and would like the Tribe to contact her to change operational activities to

ORDER - 13

1    ensure compatibility." *Id*. at 19. The Service further "confirmed that
2    shellfish aquaculture was not exempt from compatibility policy per
     Solicitor review." *Id*.

3    Consequently, Jamestown's assertion that it has a protectable interest because "[s]ince

4    2016, [it] has invested significant resources to secure permitting and maintain compliance

5    with relevant regulations," and that it is relying on the projected income is unavailing.

6    Dkt. 44 at 26. The Service requested that Jamestown obtain permits first so that it could

7    complete a compatibility determination. Dkt. 58-5 at 8. And the USACE permit is

8    explicit that it "does not obviate the need to obtain other Federal, State, or local

9    authorization required by law." Dkt. 39-7 at 4. Additionally, the Service completed

10   compatibility determination for past aquaculture farming within the refuge by

11   Jamestown. Dkt. 58-7 at 3. In any event, Jamestown invested resources while in

12   communication with the Service about the compatibility determination requirements.

13       Similarly, Jamestown's assertion that the completion process for the compatibility

14   determination would be "immediately disruptive" to its lease rights and would result in

15   leaving the planted oyster seeds unmanaged is unavailing. Dkt. 63 at 12–13. Although the

16   timeline of when Jamestown began operations is unclear on the record, it had notice that

17   a compatibility determination was likely required since 2015 (Dkt. 58-5 at 4), Plaintiffs

18   promptly sued to require one by August 2023, the Court ordered that the Service had to

19   complete one in July 2024. Dkt. 20. When the Court inquired as to status of the

20   operations of the farm in September 2024, the parties responded in October that "[w]ith

21   respect to the status of the oyster farm, the parties submit that the question should be

22   addressed following resolution of the Tribe's motions." Dkt. 37 at 2. Drawing all

1    reasonable inferences in favor of plaintiffs, Jamestown appears to have planted seeds

2    after it was aware that it was probable the Service would conduct a compatibility

3    determination.

4          Contrary to Jamestown's assertions, Protect the Peninsula does not need to show

5    that "the Service has the authority to regulate the Tribe's leasehold activities and that if

6    so, Jamestown lacks a treaty right that would exempt them from a compatibility

7    determination" to prevail. Dkt. 44 at 16–17. Its claims are narrowly tailored to requiring

8    the Service to follow the procedures in the Refuge Act by completing a compatibility

9    determination and/or requiring a special use permit. Jamestown is not a necessary party

10   under Rule 19 because it lacks a protected interest for purely procedural and prospective

11   claims.[3] Because Jamestown is not a required party to the procedural challenges, the

12   Court need not proceed to the "indispensable party" analysis under Rule 19(b). *Makah*,

13   910 F.2d at 559.

14   **B.    Public rights exception**

15         Even if Jamestown were a required party to the procedural claims, they would not

16   be "indispensable" because of the public rights exception to traditional joinder rules. *See*

17

18         [3] The Court recognizes that it granted intervention as a matter of right under Rule 24 and
     that given the similarity in standards, it implied Jamestown qualifies as a required party for

19   purposes of Rule 19. However, at the time the Court granted intervention, it lacked the benefit of
     briefing on the relationship between Jamestown lease and the Service's easement, and the extent

20   of the communications between the Service and Jamestown regarding the compatibility
     determination process, or the public rights exception to joinder rules. Dkts. 56, 58-5. Interpreting

21   the record broadly in favor of intervention, it assumed that Jamestown was "situated such that
     disposition of the action may impair or impede [its] ability to protect [its] interest[s]," Fed. R.

22   Civ. P. 24. The additional briefing has revealed that the claims here do not in fact impair or
     impede a protectable interest.

*Conner,* 848 F.2d at 1459–61. The exception allows a case to proceed without a

necessary party even if the absent party's interest may be adversely affected, so long as

the litigation seeks to vindicate a public right and does not destroy the absent party's

legal entitlements. *Id.* at 1460; *see also Manygoats v. Kleppe,* 558 F.2d 556, 558–59 (10th

Cir.1977) (tribe necessary but not indispensable to procedural challenge to environmental

impact statement); *National Wildlife Fed'n v. Burford,* 835 F.2d 305, 333 (D.C.Cir.1987)

("administrative litigation commonly inflicts drastic effects on absent third parties" but

"potential unfairness seems in accord with what we often tolerate"). In coining the

exception, the Supreme Court reasoned that "[i]n a proceeding . . . narrowly restricted to

the protection and enforcement of public rights, there is little scope or need for the

traditional rules governing the joinder of parties in litigation determining private rights."

*Nat'l Licorice Co. v. NLRB*, 309 U.S. 350, 363 (1940).

    *Makah* once again proves instructive. The Ninth Circuit determined that even if

the absent tribes were necessary to the procedural claims, the public rights exception

would apply:

> Congress explicitly made FCMA regulations subject to judicial review. The
> Makah seek to use that tool to question whether the 1987 regulations were
> lawfully adopted in the first place. To the extent the Makah seek to enforce
> the duty of the PFMC and the Secretary to follow statutory procedures in
> the future, this is a "public right" and this action becomes one that
> potentially benefits all who participate in the ocean fishery.

910 F.2d at 559 n.6, (9th Cir. 1990). The same logic holds here. Congress made the

Refuge Act regulations subject to judicial review under the APA. Protect the Peninsula

seeks to enforce the Service's duty to follow statutory procedures in the Refuge Act for

1    Jamestown's proposed farm. Plaintiffs' focus is on protecting wildlife on publicly owned

2    property within the Refuge; it has no discernable private interest at stake. *C.f. Kescoli v.*

3    *Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996) (declined to apply the public rights

4    exception because of the "essentially private nature" of plaintiffs' interests and the case).

5    Compliance with the statutory procedures in the Refuge Act is undoubtably a public right

6    that safeguards environmental protection.

7        Complying with the Refuge Act procedures does not "destroy [Jamestown's] legal

8    entitlements." *Kescoli*, 101 F.3d at 1311. Even if the Court grants all the relief sought by

9    Protect the Peninsula, the current lease and any treaty rights Jamestown has will remain

10    fully intact. Only the public right to administrative compliance with the Refuge Act

11    procedural requirement to complete a compatibility determination and/or require a special

12    use permit are ripe for adjudication. Jamestown cannot show that either impedes its lease,

13    sovereignty, or treaty rights.

14                                **III.  ORDER**

15        Therefore, it is hereby **ORDERED** that Jamestown's motion to dismiss, Dkt. 44, is

16    **DENIED**.

17        Dated this 15th day of May, 2025.

18

19

20                                BENJAMIN H. SETTLE
                                 United States District Judge

21

22